IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JUDITH A. LEWIS,

        Plaintiff,

vs.

        Case No. 04-1116-JTM

ITT HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

        Defendant.

**MEMORANDUM AND ORDER**

This matter comes before the court on the parties' cross-motions for summary judgment (Dkt. Nos. 30, 32). Plaintiff argues that she did not receive a full and fair review and that substantial evidence does not support defendant Hartford's termination decision. Defendant objects to these assertions and argue that Hartford properly terminated plaintiff's benefits under the terms of her plan. Further, defendant argues that its review procedures complied with Department of Labor Regulations and ERISA. For the reasons set forth herein, the court grants in part and denies in part the cross-motions for summary judgment.

**I. FINDINGS OF FACT**

Ms. Lewis is a beneficiary under the Long-Term Disability Plan (hereafter "Plan"). The Plan is a long-term disability group insurance policy issued to Columbia/HCA Healthcare Corporation, which provided coverage to plaintiff when she was an employee of Wesley Medical Center. Hartford is the insurance carrier for the Plan, Policy Number ITT Hartford Policy GLT

034174 and made all decisions relating to Ms. Lewis' claim for long-term disability benefits under the Plan.

In pertinent part, the policy defined disability with reference to the first 24 months after the elimination period and any period after the first 24 months as follows:

> **Total Disability or Totally Disabled** means that:
> (1) during the Elimination Period; and
> (2) for the next 24 months, you are prevented by;
>     (a)    accidental bodily injury
>     (b)    sickness;
>     (c)    mental illness;
>     (d)    substance abuse; or
>     (e)    pregnancy,
> from performing the essential duties of your occupation, and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged in a program of Rehabilitative Employment approved by us.
>
> After that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training, or experience.
>
> Your failure to pass a physical examination required to maintain license to perform the duties of your occupation does not alone mean that you are Totally Disabled.

Adm. R. 20. The Plan provided for termination of benefits on the date that an employee participant was no longer disabled or failed to furnish proof, when requested by Hartford, of continued disability. The Plan also defined the authority of Hartford to interpret the Plan and the factual circumstances of a particular claim: "The Hartford has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." Adm. R. 34.

On May 16, 1995, while employed by Wesley Medical Center, the plaintiff suffered what was termed a cardiovascular accident and ceased work. On that date, Ms. Lewis became disabled

and eligible for long-term disability benefits under the Plan, subject to an elimination period. She began receiving disability benefits effective November 1995.

By letter dated February 25, 2003, Hartford notified the plaintiff that it wished to update its records as to her continuing eligibility for disability payments. Adm. R. 236. By letter dated April 10, 2003 to Dr. James Logan, the plaintiff's attending physician, Hartford requested copies of medical records and specifically inquired "How does the patient's condition impair their [sic] ability to work?" Adm. R. 221. Dr. Logan's handwritten response to this was "Mild hemiparesis and anxiety." Adm. R. 218. Dr. Logan completed a Physician's Statement of Continued Disability which he signed March 19, 2003. No comment was made with reference to a question as to psychiatric impairment. He described her condition as follows:

> **Primary diagnosis** CVA     **secondary diagnosis**        L hemiparesis
> **subjective symptoms** L side weakness     **Physical examination findings:** weak on L side
> **Impairment: standing** ok, **walking** ok, slightly off balance **sitting** ok
> **Lifting/carrying: reaching/working overhead: Pushing: Pulling:** a little weak on L side; **driving:** ok **Keyboard use/repetitive hand motion:** unknown
> **If physical or psychiatric limitations exist, how long do you feel limitations will last?** She has mild anxiety.

Adm. R. 231-233.

In addition, Hartford received on March 25, 2003, a questionnaire completed by the plaintiff. In response to a question requesting that the plaintiff "describe [her] current medical condition or conditions (including the specific limitations or restrictions they place on your ability to work)," the plaintiff stated only "weakness left arm & leg – headaches – fatigue." Adm. R. 225. She also described her ability to do "the types of activities that you do during the course of a typical day" (Adm. R. 225, ¶2) and hobbies. She responded in the negative to an inquiry as

3

to whether she had cognitive impairment that rendered her unable to perform common tasks such as using the phone, money management or medication management. Adm. R. 225-27.

By letter dated May 13, 2003, Hartford requested that the plaintiff complete a form entitled work and educational history. Adm. R. 199. Plaintiff's response to questions about her education indicated she is a high school graduate and attended Friends University in Wichita but did not graduate. Her work experience was described as follows: from 1970 through 1977 she was an office manager, production coordinator and secretary; from 1977 through 1979 she was a sales clerk of industrial tools; from 1979 through 1980 she was a buyer of materials needed in manufacturing construction machinery; from 1981 through 1982 she was an office manager, which included secretarial, bookkeeping, buying materials, payroll and monthly reports. Her most recent employment from February 1984 to the date of her CVA was a buyer at Wesley Medical Center and her duties included purchasing medical and non-medical items. Adm. R. 134-135.

As a part of its review, Hartford referred the medical record to Medical Advisory Group, LLC for an independent medical review. Adm. R. 181. By letter dated June 3, 2003, the Medical Advisory Group advised Hartford that the file had been assigned to Internal Medicine Specialist Coleman Levin, M.D., for such review. Adm. R. 180. Dr. Levin contacted Dr. Logan to clarify the plaintiff's physical and functional capabilities for employment. By letter dated June 13, 2003 to Dr. Logan, Dr. Levin summarized the conversation to the effect that Dr. Logan believed that the plaintiff "had the physical capacity to perform a sedentary occupation" and "recommended a job without undue stress." The letter requested that Dr. Logan approve it and return a copy to Dr. Levin, but Dr. Logan failed to do so. Adm. R. 173. Dr. Levin then prepared

and submitted to Hartford a detailed medical report dated June 13, 2003 summarizing Dr.

Logan's medical records and other related records concluding as follows:

> Ms. Lewis is a 59-year-old woman who had a right temporal lobe CVA in 1995 with residual mild left hemiparesis.
> ...
>
> In 2001, she had three episodes of transient left facial weakness and episodes of slurred speech. The medical record reveals no recurrence of these events over the past 18 months. Work-up in December of 2001, revealed a negative carotid sonogram and a normal CT scan of the brain. In December 2002, the claimant had a 15-minute period of unresponsiveness while eating a meal with friend. There is no reporting of any neurological findings and no report of recurrent episodes of unresponsiveness.
>
> It is my opinion that although the above described neurological episodes are worrisome and may pressage a future nervous system event, the history of their having occurred does not preclude the claimant's ability to perform full-time employment. Likewise, the mild left-sided weakness from the CVA in 1995 would not, in my opinion, prevent Ms. Lewis from performing a sedentary occupation.
>
> **I agree with Dr. Logan that Ms. Lewis currently has the physical capacity to perform a sedentary occupation.**
>
> CONCLUSION: Based on my review of the medical record and my conversation with the claimant's primary care physician, Dr. James E. Logan, it is my opinion that Ms. Lewis has the physical capacity to meet the demands of a sedentary occupation as defined in the <u>Dictionary of Occupational Titles</u> of the U.S. Department of Labor. I believe her restriction to a sedentary occupation with minimal ambulation is permanent.
>
> Due to Ms. Lewis' reported anxious state, I believe she would have the best opportunity for employment success if she worked in a job without undue stress.

Adm. R. 174-176 (emphasis added).

Hartford then referred the file to its Vocational Department for an employability analysis. Adm. R. 133. This resulted in an employability analysis dated June 27, 2003 outlining the plaintiff's education, training and work history and determining that her transferrable skills would allow her to perform a number of sedentary jobs. The report drew heavily upon the

5

Dictionary of Occupational Titles published by the U.S. Department of Labor. The report concluded as follows:

> Analysis Results:
> As a Buyer, Ms. Lewis was responsible for purchasing, scheduling communication of medical and non-medical items. She also worked as a procurer of all materials needed in manufacturing of construction machinery. As an Office Manager, she was responsible for secretarial duties, bookkeeping, processing payroll, preparing monthly reports and purchasing materials. The transferable skills, math skills, bookkeeping skills, following instructions and the ability to perform multi-tasking, reading and verbal communications skills. The vocational implication is semi-skilled to unskilled jobs.
>
> Ms. Lewis's demonstrated worker function trait data, people and things from prior work history include compiling, speaking-signaling and handling. The demonstrated temperaments from prior work experience include performing a variety of duties, attaining precise limitations/tolerances and dealing with people.
>
> The identification of occupation or (s) [sic] in this analysis is based solely on the transferability of skill methodology and work experience(s), in consideration of the noted medical restrictions and functionality mentioned above. The following occupations identified are reasonable based on work experiences; they require no formal retraining and can be learned on the job.
>
> Procurement Clerk [249.367-066] Sedentary, Semi-Skilled, SVP 4, OES $13.33
> Repair Order Clerk [221.382-022] Sedentary, Semi-Skilled, SVP 3, OES $14.71
> Appointment Clerk [237.367-010] Sedentary, Semi-Skilled, SVP 3, OES $9.63
> Scheduler [238.367-034] Sedentary, Semi-Skilled, SVP 3, OES $9.63
> Scheduler, Maintenance [221.367-066] Sedentary, Semi-Skilled, SVP 4, OES $14.71
> Information Clerk [237.367-022] Sedentary, Semi-Skilled, SVP 4, OES $9.63

Adm. R. 131-132, 140-161. Plaintiff disputes the factual accuracy of the report arguing that it relies on Dr. Levin's opinion, which in turn is based on consultation with Dr. Logan, which is refuted. Plaintiff also states that the analysis purports to be "filtered by RCCM based on a formal transferable skills analysis," [Adm. R. 131, ¶4] yet does not define "formal transferrable skills analysis" and there is no indication that the limitation of "undue stress" was taken into account. To the contrary, the "Analysis Results" states that "Ms. Lewis' demonstrated worker function

6

trait data, people and things from prior work history include compiling, speaking–signaling and handling." [Adm. R. 131] These "demonstrated worker function trait data" items used in the analysis occurred prior to the onset of Ms. Lewis' disabling medical problem in 1995.

Hartford paid benefits to July 1, 2003, but has refused to make payment for any benefit period after July 1, 2003, to Ms. Lewis.  By letter dated July 8, 2003, Hartford notified the plaintiff that her benefits were to be terminated effective July 1, 2003.  Adm. R. 163.  Hartford included a detailed list of "specific information" on which it based its denial, which included the following: "Documented phone conversation with Dr. Logan on 06/13/03," "Medical report from Dr. Coleman Levin an independent medical consultant from the Medical Advisory Group, (MAG), dated 06/13/03," and "Employability Analysis Report completed by the Rehabilitation Clinical Case Manager for the Hartford dated 06/30/03."  Adm. R. 163-164.  The notification also contained a detailed explanation of the provisions of the Plan, the records that were reviewed, findings reflected by the records and instructions as to how to file an appeal of the termination.  In particular, the letter contained several paragraphs discussing the medical evidence that the plaintiff is no longer disabled and also several paragraphs outlining the employability analysis report prepared by Hartford's vocational department based upon her work capacity, medical restrictions and limitations, and her education, training and work history.  The letter concluded with an explicit statement that "[you] are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim."  Adm. R. 163-166 (Exhibit D).

In its termination letter [Adm. R. 163-166], Hartford stated that it relied upon a telephone conversation Dr. Levin had on June 13, 2003 with Dr. Logan, Ms. Lewis' treating physician.

7

Hartford contends that "Dr. Logan indicated that you [Ms. Lewis] had the physical capacity to perform a sedentary occupation . . . Dr. Logan documented a consensus of opinion concluding that you have the capacity to perform a sedentary occupation on a full time basis." Adm. R. 165. The administrative record shows an entry by Dr. Logan on June 11, 2003 indicating that he had a telephone conversation with Dr. Levin. Adm. R. 101. On June 13, 2003, Dr. Levin attempted to summarize his conversation with Dr. Logan including a statement that, "I will attempt to summarize our conversation, You believed that Ms. Lewis had the physical capacity to perform a sedentary occupation. . . . If I do not hear from you within five business days via fax to 603-378-0740, I will assume that I have accurately summarized our conversation." Adm. R. 139. The administrative record does not show that Dr. Logan responded before July 24, 2003 or that Dr. Logan concurred with Dr. Levin's summary of their phone conversation.

By letter dated July 24, 2003, and received by Hartford on July 28, 2003, Dr. Logan, the plaintiff's attending physician, advised Hartford of his disagreement with the termination of benefits and of his interpretation of the phone conversation with Dr. Levin to the effect that he was only giving permission of a work assessment. Adm. R. 100-101. Specifically, Dr. Logan stated, "I basically said I suppose it is possible for her to be assessed for a sedentary low-stress job, and I gave permission for an assessment of such. I did not say that she could work. I gave permission for her to be assessed." [Adm. R. 100] Hartford did not have the benefit of Dr. Logan's July 24, 2003 letter at the time it issued its initial termination decision on July 8, 2003. [Adm. R. 163] However, even though Hartford had Dr. Logan's July 24, 2003 letter when it issued its final termination decision on September 30, 2003 [Adm. R. 54], it continued to premise the termination on Dr. Levin's report of his telephone conversation with Dr. Logan,

8

which Dr. Logan refuted.

By letter dated August 5, 2003, Hartford informed the plaintiff of Dr. Logan's letter of July 24, 2003, and again gave her written notice of the appeal procedure and instructed her that she could provide additional information for consideration. Adm. R. 102.

By letter dated August 17, 2003, Ms. Lewis appealed Hartford's termination of benefits dated July 8, 2003. Adm. R. 103. Hartford acknowledged the request by letter of September 2, 2003 and noted that the appeal would be conducted by a different individual. Adm. R. 99. The new reviewer determined to refer the plaintiff's medical condition to the University Disability Consortium in Newton Highlands, Massachusetts for further independent review and the Consortium assigned Dr. Brian Mercer, a board certified neurologist, to the review. Adm. R. 90. Hartford also notified Dr. Logan that the claim was continuing to be reviewed and that he would be contacted by another physician to discuss her medical condition and functional status. Adm. R. 93.

On September 11, 2003, medical records of treating physicians, opinions of the consulting physician Dr. Levin, and the rebuttal of Dr. Logan were forwarded to Dr. Mercer, along with referral questions, a case summary, issues to be addressed and instructions to contact Dr. Logan again. Adm. R. 89-94. Plaintiff adds that Dr. Mercer received only those records of Dr. Logan beginning in February of 1999 (Adm. R. 83), yet the case summary to Dr. Mercer included the administrator's description of medical events commencing on May 16, 1995. Dr. Mercer would not have had the benefit of personally reviewing the earlier records of plaintiff which indicated the onset of her disabling condition. Instead, he had a summary from Hartford.

Dr. Mercer spoke with Dr. Logan on September 19, 2003 and confirmed his discussion

with a letter dated September 25, 2003 to Dr. Logan. Adm. R. 87-88. The letter requested that Dr. Logan acknowledge his agreement with the contents of the letter or provide whatever additional comments or changes he wished and return it. Dr. Logan did not do so. Adm. R. 87-88.

Dr. Mercer's report noted the records that he had reviewed and his discussion with Dr. Logan on September 19, 2003. He summarized the plaintiff's condition as follows:

> Based on the medical record provided, Ms. Lewis sustained a right temporal CVA resulting in a mild residual left hemiparesis in approximately 1995. It is possible there was some exacerbation of this hemiparesis in 2001 based upon the subjective reporting in the medical records. However, there are no neurologic examinations substantiating any change in neurologic function. Based upon the description provided by Dr. Logan, her left hemiparesis is mild. He describes her losing about 25% strength in the left hand with the leg having normal strength, but the gait being a little unsteady, sometimes requiring use of a cane. The cause of her episodes in 2001 and 2002 of temporary increased left-sided weakness and one episode of unresponsiveness has not been established. Based upon objective information, the records do not provide objective information that would preclude functioning at a full-time sedentary level. This opinion is based upon the mild degree of hemiparesis described. Additionally, her cranial CT scan was normal indicating that the stroke likely was relatively small in size and undetectable by CT scan.
>
> Dr. Logan indicates that Ms. Lewis has difficulties with anxiety. He indicates that this likely would be the major factor that would preclude successful functioning in the workplace. From the general medical viewpoint, I note that her treatment for anxiety is only intermittent and she uses Xanax episodically. She has never had formal psychiatric assessment, nor had any treatment from a psychiatrist or psychologist. There are no actual panic attacks. Most individuals who are disabled by an anxiety disorder do have ongoing regular treatment with medication and psychiatric/psychological assessment and treatment. It would be reasonable to place a restriction on her functionality that she should be employed only in an occupation that is low stress. The relatively limited degree of treatment rendered for an anxiety disorder and the limited evaluation do not substantiate an anxiety disorder of such a magnitude that would preclude successful functioning in the workplace.

Adm. R. 82-88. Hartford then notified the plaintiff that it had completed its appeal review and

had determined that she was not disabled as defined in the policy. Adm. R. 80-81.

On appeal review, Hartford affirmed its termination of benefits on Ms. Lewis' claim for long-term disability benefits by letter dated September 30, 2003. Hartford stated, "We based our decision to deny benefits on policy language and all of the documents contained in the Adm. R., viewed as a whole." Adm. R. 80. Hartford also stated that, "we asked an independent consulting physician from University Disability Consortium to clarify the medical aspects of your claim. This service was provided by Dr. Mercer . . . . " Adm. R. 80. Hartford first provided Ms. Lewis a copy of the documents relating to the June 13, 2003 phone conversation with Dr. Logan, by mailing the administrative record to her attorneys on February 6, 2004.

Hartford first provided Ms. Lewis a copy of the medical report from Dr. Levin dated June 13, 2003, when it mailed a copy of the administrative record to her attorneys on February 6, 2004. Hartford first provided Ms. Lewis a copy of the Employability Analysis Report dated June 30, 2003, when it mailed the administrative record to her attorneys on February 6, 2004. Hartford first provided Ms. Lewis a copy of Dr. Mercer's opinion when it mailed the administrative record to her attorneys on February 6, 2004.

Ms. Lewis filed the instant action on April 5, 2004.

## II. STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgments as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. Jurasek v. Utah

State Hosp., 158 F.3d 506, 510 (10th Cir. 1998).  The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  Baker v. Board of Regents, 991 F.2d 628, 630 (10th Cir. 1993).  The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance.  Dayton Hudson Corp. v. Macerich Real Estate Co., 812 F.2d 1319, 1323 (10th Cir. 1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in Matsushita).  The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

**III. ANALYSIS**

The parties raised several issues in regard to the termination of benefits: 1) whether the court should apply a less deferential standard of review for the conflict of interest in this case; 2) whether plaintiff received a full and fair review; 3) whether substantial evidence justifies defendant's termination decision; 5) whether the court should reinstate benefits as the proper remedy; and 6) whether plaintiff is entitled to attorney's fees.

**A. Whether the Court Should Apply a Less Deferential Standard of Review**

Plaintiff argues that the court should apply a less deferential standard of review because Hartford operates under an inherent conflict of interest and there were serious procedural

irregularities in the administrative review. Defendant does not dispute that there is a conflict. Rather, since the Plan vests full discretion and authority in Hartford, defendant maintains that an "arbitrary and capricious" standard of review should be applied.

On August 13, 2004, the Tenth Circuit Court of Appeals issued <u>Fought v. UNUM Life Ins. Co. of America</u>, 379 F.3d 997 (10th Cir. 2004) (hereafter "Fought II"). The decision vacated an earlier order in <u>Fought v. UNUM</u>, 357 F.3d 1773 (hereafter "Fought I") and clarified the standard for reviewing denials of disability benefits where the plan administrator operates under an inherent conflict of interest. <u>Fought II</u>, 379 F.3d at 998. In <u>Fought II</u>, Shirley O. Fought continued her challenge of her insurer's denial of disability benefits under her employee's group disability plan. <u>Fought II</u>, 379 F.3d at 999. Ms. Fought's policy did not cover pre-existing conditions that "caused," "contributed to," or "resulted" in disability. <u>Id.</u> Based on this language, UNUM's plan administrator denied Ms. Fought coverage. <u>Id.</u> UNUM admitted to a conflict of interest as both payor and administrator of the plan. <u>Id.</u> In its review, the Tenth Circuit reversed and remanded the district court's grant of summary judgment in favor of the plan administrator. <u>Id.</u> at 997. The Tenth Circuit held that the plan administrator had not established by substantial evidence that claimant's complications from surgery for a pre-existing condition were not covered by the group disability plan. <u>Id.</u> at 997.

In issuing its revised standard, the court outlined two standards: one for a standard conflict of interest case and another for an inherent conflict of interest case. <u>Id.</u> at 1005-1006. For standard conflict of interest cases, the plaintiff is required to prove the existence of the conflict. <u>Id.</u> at 1005. Plaintiff must show " 'proof that the plan administrator's dual role jeopardized his impartiality.' " <u>Id.</u> at 1005 (citations omitted). As for inherent conflict of interest

13

cases, the Tenth Circuit recognized that they may exist in several circumstances: 1) where the plan administrator operates as both the insurer and administrator; 2) where there is a proven conflict of interest; or 3) when a serious procedural irregularity exists and the plan administrator has denied coverage. In these cases, the Tenth Circuit evaluated the specific obligations of both the plan administrator and the court. First, the plan administrator must demonstrate: 1) that its interpretation of the terms of the plan is reasonable; and 2) that its application of those terms to the claimant is supported by substantial evidence. Id. at 1008. Second, the court must take a "hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest." Id. In adopting this burden shifting standard, the court explicitly rejected the application of Kimber in cases of inherent conflict of interest. Id. However, the standard in Kimber remains available where a plaintiff cannot establish a serious conflict of interest. See Fought, 379 F.3d at 1005.

Since defendant does not dispute that it plays the dual role of a plan administrator and insurer, the court applies the less deferential standard of review used in inherent conflict of interest cases. While this is not a substantial departure from previous law, it does require a shift in burden. Fought, 379 F.3d at 1006.

**B. Whether Plaintiff Received a Full and Fair Review Supported by Substantial Evidence**

Based on the standard set out in Fought, the court examines whether defendant made a reasonable interpretation of its Plan and whether substantial evidence supports defendant's application. In making this determination, plaintiff focuses the court's attention on whether she received a full and fair review, specifically arguing that she did not have an opportunity to

address Dr. Levin's report, Dr. Lewis' report, and the Employability Analysis Report.  The two issues of full and fair review and substantial evidence will be addressed together.

In reviewing plaintiff's termination of benefits, the court finds that substantial evidence does not support Hartford's determination.  Several factors lead to this conclusion. First, Dr. Levin's original determination did not accurately characterize Dr. Logan's determination, even though he claimed to be in agreement with the treating physician.  Based on his letter, Dr. Logan only consented to an examination of plaintiff, not to her release from disability.  The treating physician had made clear that he was not a vocational expert, and he was unsure how Ms. Lewis would handle the stress of her work environment.  Adm. R. 100.  Defendant has not represented that Dr. Levin conducted a formal work assessment or that he has the qualifications to do so.

Next, the independent review Dr. Mercer conducted relied on inconclusive evidence on Ms. Lewis' anxiety.  While the treating physician had repeated that an assessment was necessary, Dr. Mercer assumed that a lack of therapy or regular medication conclusively proved that Ms. Lewis would not be inhibited from work. However, his assessment only stated that "most people" with anxiety disorder require ongoing treatment. Dr. Mercer had not examined Ms. Lewis to reach this conclusion and his only information was an unverified phone conversation with Dr. Logan.  Dr. Mercer's assessment ignores the fact that Ms. Lewis was on long term disability and not currently experiencing the stress that may be present from a low-stress, sedentary job.

Defendant cites several cases in support of its contention that substantial evidence supports its finding.  After careful review, the court finds these cases factually distinguishable from this case.  In <u>Abromitis v. Continental Casualty Co.</u>, 114 Fed. Appx. 57, 2004 WL 2491367

(4th Cir. 2004), the court upheld the termination of the plaintiff's long-term disability benefits. In Abromitis, the plaintiff's treating physician reported that the beneficiary was capable of "sedentary to light work with no travel and sit/stand option." Id. at *2. The doctor had indicated that plaintiff could not return to her previous occupation, leaving open the possibility that she could return to another position. Id. at *5. Based on this assessment, the court found substantial evidence supported CNA's decision. Id. Defendant also references the case for the principal that plaintiff's submission of a personal evaluation would have been given little weight.

Here, Dr. Logan denied ever stating that Ms. Lewis could return to work. At best, Dr. Logan indicated that she should be assessed to determine if her anxiety, presumably along with her other conditions, would limit her ability to work. Dr. Levin's reliance on the treating physician's alleged statement that his patient could perform low stress sedentary work cannot be justified when the treating physician clearly indicated there was a misinterpretation. Furthermore, defendant's reliance on Abromitis is misplaced for the argument that a personal evaluation would not be valuable. In Abromitis, the doctor had clearly indicated the patient could work in other occupations, and there was no misinterpretation of the doctor's recommendation. While the additional evaluation was not required or considered helpful in Abromitis, it could be valuable here.

In the remaining cited cases,[1] the defendant continues to rely on situations where the

---

[1] The parties also extensively discuss Metzger v. UNUM Life Insurance Company. In it, U.S. District Court Judge Monti Belot found that plaintiff did not have an opportunity to review the opinion upon which her denials were based and granted her additional time to respond. The court noted that in four days after the medical report was issued, the plan administrator denied benefits. Plaintiff notes that in this case there were five days between the issuance of the report and Hartford's denial of benefits. While Metzger provided a detailed and extensive analysis of the requirements for a full and fair hearing, this court has chosen to rely on other opinions since

treating physician made clear an ability to work in other occupations and/or where the doctors had undertaken a personal examination. Under such circumstances, an independent vocational evaluation may not be necessary. See Duhon v. Texaco, 15 F.3d 1302, 1304-05 (noting that three separate doctors evaluated Mr. Duhon in person, and all three concluded that the beneficiary could not return to his previous job and one of the doctors concluded that Mr. Duhon could return to light sedentary work, which did not contradict the other evaluations); White v. The Prudential Insurance Compay of America, 354 F. Supp.2d 1008, 1022 (2005) (denying LTD benefits where the treating physician submitted a letter with a more complete list of ailments indicating disability but did not submit records to support this opinion despite the insurer's requests). Here, although not required, none of the independent reviews conducted a personal examination of Ms. Lewis nor did they agree on the essential conclusions of her ability to work. In fact, Dr. Logan submitted a letter disputing the alleged conversation on which defendants relied in initially denying benefits. Further, Dr. Mercer continued to rely on Dr. Logan's purported statement, even after a second phone conversation. Despite Dr. Logan's insistence for an assessment, both independent evaluators continued to rely on incomplete records and the misconstrued statement. At no time was an assessment for plaintiff's anxiety undertaken so as to clarify whether this would prevent Ms. Lewis from working. The lack of evidence as to plaintiff's ability to work also led to an incomplete vocational evaluation, since Ms. Lewis' anxiety was not properly assessed and included in the vocational expert's report. Together, the reliance on a misstatement, speculation as to the effect of the anxiety disorder, and use of incomplete records indicate a lack of substantial evidence to find a full and fair hearing.

---

Metzger is currently on appeal.

Although defendant argues that plaintiff did not request copies of her administrative record, this is not dispositive in light of the facts. After the initial termination of benefits, plaintiff's doctor wrote an additional letter clarifying his position on Ms. Lewis' ability to work. Despite this information and an additional review by Dr. Mercer with the benefit of Dr. Logan's letter and a subsequent phone conversation, defendant denied plaintiff's appeal without any substantive inquiry into plaintiff's anxiety. The independent examiner only stated the condition as to "most" people with anxiety disorder without any determination of Ms. Lewis' specific condition. Defendant's lack of proper inquiry into plaintiff's ability to work led to an unsupported termination of benefits.

While Hartford's Plan permits it full discretion, the court is required to take a hard look at the defendant's analysis. Where a repeat misinterpretation taints the denial of disability and the insurer does not conduct an assessment which the treating doctor had originally recommended, the court cannot find that plaintiff received a full and fair hearing that is supported by substantial evidence.

As a result, Hartford is instructed to review the question of plaintiff's anxiety disorder in relation to her claim for disability. The parties are strongly encouraged to consider undertaking an assessment of plaintiff's anxiety in reaching a determination on the disability claim, so as to substantiate any determination. By way of this opinion, the court is not attempting to add requirements to Hartford's screening process but attempting to assure that plaintiff did in fact have a full and fair hearing supported by substantial evidence and untainted by the dual role played by the administrator and insurer.

**C. Whether the Court Should Reinstate Benefits**

Plaintiff argues that the court should vacate the termination of benefits and order benefits reinstated. Defendant disagrees, arguing that such a substantive remedy is not justified unless the procedural defect caused substantive harm.

In support of her contention, plaintiff relies on Halpin v. WW Grainger, 962 F.2d 685, 687 (7th Cir. 1992). In Halpin, the district court found that the plan administrator did not comply with regulatory requirements for a full and fair review and thus reinstated benefits. Id. at 697. On appeal, the Seventh Circuit agreed with the reinstatement noting that defendant had not comported with ERISA in its notification of termination at the very outset of the administrative review. Id. at 691. The defendant only asked plaintiff to submit "any facts or pertinent information" without clarification on what was required to perfect the claim. Id. at 691. On the other hand, the court in Ellis v. Metropolitan Life Insurance Co., 126 F.3d 228, 238 (1997) held that there must be a causal connection between the procedural defects and the denial of a claim.

At present, the court finds it best to remand this case for further consideration as set forth herein. The court may reconsider the issue of reinstatement after such review.

**D. Whether Plaintiff is Entitled to Attorney's Fees**

Finally, the parties argue the relative merits of awarding attorney's fees in this case.

In determining whether to award attorney's fees, the court reviews the factors in Eaves v. Penn, 587 F.2d 453, 465 (10th Cir. 1978). It provides in relevant part:

> (1) the degree of the offending parties' culpability or bad faith; (2) the degree of the ability of the offending parties to personally satisfy an award of attorney fees; (3) whether or not an award of attorney fees against the offending parties would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' position.

Id. Plaintiff asserts that defendant's persistence in relying on Dr. Logan's purported statement demonstrates bad faith. The court does not find this to be the case as it is not clear whether Hartford's denial was in bad faith. Furthermore, as defendant notes, remand does not necessarily mean that plaintiff is the prevailing party. ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

IT IS ACCORDINGLY ORDERED this 11th day of October 2005, that the court grants in part and denies in part the parties' cross-motions for summary judgment (Dkt. Nos. 30, 32).

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE